**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | **CRIMINAL ACTION** |
| **VERSUS** | **NO. 24-245** |
| **KERNELIUS ALFORD** | **SECTION: D (1)** |

## ORDER AND REASONS

Before the Court are three Motions to Suppress filed by Defendant Kernelius Alford.[1] The Government filed Responses in Opposition to each.[2] Defendant has filed Replies.[3] The Court subsequently held a hearing on the Motions on September 23, 2025. After careful consideration of the parties' memoranda, the record, evidence presented at the hearing, and the applicable law, the Motion to Suppress Evidence, Fruits, and Statements on May 2, 2024, and the Motion the Suppress Statements on November 21, 2024[4] are **DENIED**. The Motion to Suppress Evidence and Fruits Seized on November 21, 2024,[5] is **GRANTED in part** and **DENIED in part**.

## I.    FACTUAL AND PROCEDURAL BACKGROUND

The instant Motions to Suppress concern two encounters between law enforcement and Defendant Kernelius Alford, one on May 2, 2024 and one on November 21, 2024. The facts of each of these encounters with law enforcement will be discussed in turn.

---

[1] R. Docs. 36, 37, 38.
[2] R. Docs. 43, 44, 45.
[3] R. Docs. 47, 48.
[4] R. Docs. 36, 37.
[5] R. Doc. 38.

### A.  The May 2, 2024 Encounter

Deputy Andrew Scott of the Jefferson Parish Sheriff's Office ("JPSO") was on patrol in Fat City, a neighborhood in Metairie, when he observed a gray Range Rover with tinted windows and an obscured license plate.[6]  From a prior meeting with a concerned citizen and prior research, Scott believed the driver of this vehicle to be Kernelius Alford.[7] Based on the tinted windows and obscured license plate, Scott attempted to initiate a traffic stop, but the driver began accelerating before he could be stopped.[8] Scott then began to pursue the vehicle.

While pursuing the vehicle, another police car drove past them with its police lights on.[9] Following this, Alford's vehicle began driving faster in an attempt to escape law enforcement.[10] Alford's vehicle then ran a stop sign and  then crashed into another car.[11] Shortly after, Alford stopped his vehicle in the middle of the road and began fleeing on foot.[12] Deputy Scott then exited the police car and gave chase, chasing Alford into a fenced backyard where the officer drew his service weapon, causing Alford to surrender himself.[13] The officer then instructed Alford to lay on his stomach and arrested him.[14] After apprehending Alford, the officer brought Alford back to a JPSO patrol vehicle.[15] The arresting officer then removed cash from Alford's

---

[6] R. Doc. 43-5 at p. 8.
[7] *Id.*
[8] *Id.*
[9] R. Doc. 43-1, *Dashboard Camera Footage from the Arrest of Kernelius Alford on May 2, 2024* ("*Alford Arrest Dashcam*") at 0:35.
[10] *Id.* at 0:38.
[11] *Id.* at 0:50.
[12] *Id.* at 1:00-1:01.
[13] R. Doc. 43-1, *Body Camera Footage of Arresting Officer of Kernelius Alford on May 2, 2024 ("Arresting Officer's Bodycam")* at 0:59-1:20.
[14] *Id.* 1:35.
[15] R. Doc. 43-1, *Alford Arrest Dashcam* at 2:43.

front pocket and asked him if he had any identification on his person, to which Alford responded he did not.[16] Alford then stated that the "truck" (his vehicle) was in his name and that there were two firearms in the vehicle, and the officer then placed Alford into the backseat of the police cruiser.[17] Scott then asked Alford if he was a felon, and Alford nodded.[18] The arresting officer then read Alford his Miranda rights and placed the defendant under arrest. Alford declined to make a statement.[19] The encounter described above is recorded on dashcam and law enforcement body cam video. Three law enforcement officers began searching Alford's car shortly thereafter.[20]

The police officers then discovered unsealed marijuana and a scale in a backpack on the passenger seat.[21] They then found two firearms and a sealed package of marijuana within the same backpack.[22] Continuing their search, the officers found cash and a ski mask in the backseat.[23] The searching police officers removed the evidence from Alford's vehicle and brought the evidence back to the police vehicle.[24] Another officer also removed Alford's cellphone from the driver's seat cup holder and returned to their vehicle with the phone.[25]

---

[16] R. Doc. 43-1, *Arresting Officer's Bodycam* at 3:25-3:29.
[17] *Id.* at 3:30-3:37.
[18] *Id.* at 3:40-50.
[19] *Id.* at 4:00.
[20] R. Doc. 43-1, *Body Camera Footage of First Searching Officer of Kernelius Alford's Vehicle on May 2, 2024* ("*First Searching Officer's Bodycam*") at 0:04.
[21] *Id.* at 0:47.
[22] R. Doc. 43-1, *Body Camera Footage of Second Searching Officer of Kernelius Alford's Vehicle on May 2, 2024* ("*Second Searching Officer's Bodycam*") at 0:47-0:52.
[23] R. Doc. 43-1, *First Searching Officer's Bodycam* at 1:18.
[24] *Id.* at 1:03-1:11.
[25] *Id.* at 2:00-2:13.

1.  **Motion to Suppress Evidence, Fruits, and Statements on May 2, 2024**

Alford filed a Motion to Suppress related to his encounter with law enforcement on May 2, 2024, arguing violations of his Fourth and Fifth Amendment rights under the U.S. Constitution.[26] First, Alford alleges that the officer's interrogation of him did not adhere to the requirements of *Miranda v. Arizona* because the officer initiated an interrogation by inquiring if Alford was a felon without advising Alford of his right to remain silent and right to counsel.

The Government argues that Deputy Scott had reasonable articulable suspicion to initiate the traffic stop and probable cause to believe that Alford "had committed multiple traffic and criminal offenses."[27] Under the plain view doctrine and automobile exception, the Government avers that the officers had the authority to search Alford's vehicle. Additionally, the Government contends that Alford's statements to Deputy Scott were spontaneous and voluntary and that the deputy's questions following were merely follow-up questions posed "to clarify any ambiguity in the spontaneous statements without broadening their scope."[28]

**B. The November 21, 2024 Encounter**

In the intervening period between the two encounters with law enforcement, Alford was indicted by a federal grand jury of the Eastern District of Louisiana on November 15, 2024, and an arrest warrant was issued.[29] Homeland Security

---

[26] R. Doc. 36.
[27] R. Doc. 43 at p. 7.
[28] *Id.* at p. 14.
[29] *See* R. Doc. 1.

4

Investigations ("HSI") received information that Alford was residing in the Ramada Inn on the I-10 Service Road in Metairie.[30]  HSI contacted the JPSO to assist with the execution of the arrest warrant and apprehension of Alford.[31] On November 21, 2024, the JPSO obtained a search warrant signed by a state court judge to search Room 315 of the Ramada Hotel, located at 3400 South I-10 Service Road, Metairie Louisiana.[32] The search warrant described the specific items that law enforcement sought and recounted Alford's criminal history, the indictment returned by a federal grand jury against him, and the statements of the hotel manager that Alford and his girlfriend regarding their living at the hotel.[33] The warrant contained no other connection between the hotel room and Alford other than the fact that he was currently residing in Room 315 of that hotel and had been residing there since July 1, 2024.[34] It also failed to specify what statutory violations were the target of the search of the hotel room.[35]

JPSO and HSI executed the search warrant that afternoon. After knocking, announcing themselves, and receiving no response, they used a key card to attempt to enter the room.[36] Officers were not able to enter due to the safety latch, and the Government avers that Alford said, "Wait!" and walked toward the bathroom.[37] Officers then rammed open the door, took Alford into custody, and led him out of the

---

[30] R. Doc. 45 at p. 3.
[31] *Id.*
[32] R. Doc. 45-2.
[33] *Id.* at pp. 1-2.
[34] *Id.*
[35] *Id.* at p. 1.
[36] R. Doc. 44-3 at p. 5.
[37] *Id.*

room. The subsequent search of the hotel room revealed a clear plastic bag with 7.5 grams of methamphetamine and a clear plastic bag that contained 5.7 grams of cocaine, a digital scale, 26 tramadol 50 mg. pills, a Glock, Model 27, .40 caliber pistol with 13 live rounds, all inside of a backpack. The search also revealed 7 grams of heroin in a clear plastic bag concealed between two coffee cups on a counter.[38]

Once Alford was taken out of the room, he was placed in handcuffs; there is no video documentation of the intervening seventeen minutes between the time he was arrested and the time when Sergeant Daniel Lassus activated his body-worn camera ("BWC").[39] The Government avers that Alford was advised of his *Miranda* rights during this intervening period; Alford disputes this, claiming that the police report contains no mention of any advisement of right or questioning. During the suppression hearing, Sgt. Lassus testified that he heard Detective Evans advise Alford of his *Miranda* rights.[40] Once Sgt. Lassus turned on his BWC, he approached Alford, advised him of his *Miranda* rights, and performed a custodial interrogation regarding who owned the drugs found during the search of the room.[41]

Alford filed two Motions to Suppress related to his encounter with law enforcement on November 21, 2024, arguing violations of his Fourth and Fifth Amendment rights.

---

[38] *Id.*
[39] R. Doc. 44 at p. 2; R. Doc. 47 at p. 1.
[40] Transcript of Evidentiary Hearing ("Transcript") at p. 43.
[41] R. Doc. 44-3 at p. 6.; Transcript at pp. 49-50.

1.  **Motion to Suppress Evidence and Fruits Seized on November 21, 2024**

Alford moves to suppress all evidence obtained by law enforcement during and because of the November 21, 2024, search of the hotel room at the Ramada Inn. Alford argues that affidavit upon which the search warrant was based failed to establish probable cause to search the hotel room and "laced even *indicia* of probably cause of nexus" between the alleged criminal activity and the hotel room.[42] The Government argues that the search warrant "meets the constitutional requirement of probable cause" because the affidavit established a nexus between the alleged criminal activity and the hotel room that was searched.[43] Even if there was not probable cause for the warrant, the Government contends that evidence seized should not be suppressed because of the good faith exception articulated in *United States v. Leon*, 468 U.S. 897 (1984). Alford replies that the Government conflates probable cause to arrest and probable cause to search and that the warrant only describes probable cause to arrest.[44] Additionally, Alford argues that the Government's reliance on information not contained in the affidavit in its Response is precluded by law and that, even if considered, still fails to create probable cause to search.[45]

2.  **Motion to Suppress Statements on November 21, 2024**

Alford additionally moves to suppress the statements obtained by law enforcement in violation of his Fifth Amendment rights and *Miranda v. Arizona*. He

---

[42] R. Doc. 38-1 at p. 6.
[43] R. Doc. 45 at pp. 6,8.
[44] R. Doc. 48 at p. 1.
[45] *Id*. at p. 8.

asks this Court to suppress the statements made before being advised of his Miranda rights as well as the statements made after being advised of his rights "because they were the result of an illegal two-step interrogation process."[46] The Government responds that there are no specific pre-*Miranda* warning inculpatory statements that would give rise to an impermissible two-step interrogation process.[47] In his reply, Alford emphasizes that it is the Government's burden to prove that its agents complied with the requirements of *Miranda* and avers that the officers' interview of Alford had already begun before being advised of his rights.[48]

## II.    LEGAL STANDARD

### A. The Fourth Amendment

The Fourth Amendment guarantees that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."[49]

#### 1.  Search Warrants

"A valid search warrant may be issued only upon a finding of probable cause."[50] A court may not look outside the affidavit to find probable cause to issue a search

---

[46] R. Doc. 37-1 at p. 5.
[47] R. Doc. 44.
[48] R. Doc. 47.
[49] U.S. CONST. amend. IV.
[50] *United States v. Perez*, 484 F.3d 735, 740 (5th Cir. 2007) (citing *United States v. Brown*, 941 F.2d 1300, 1302 (5th Cir.1991)).

warrant.[51] The warrant "'must establish a nexus between the house to be searched and the evidence sought'—either by 'direct observation or through normal inferences as to where the articles sought would be located.'"[52] Even if an affidavit for a warrant were insufficient to establish probable cause, the evidence will not be suppressed if it was "obtained by officers in objectively reasonable good-faith reliance upon a search warrant."[53] However, this exception "does not apply—and the evidence is inadmissible—if the affidavit was 'so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable.'"[54] Such "bare bones" affidavits consist of "wholly conclusory statements" and do not provide the facts and circumstances necessary to link the criminal activity to the place being searched.[55]

## 2. Warrantless Searches of Vehicles

"A warrantless search is presumptively unreasonable unless it falls within an exception to the Fourth Amendment's warrant requirement."[56] One such exception to the Fourth Amendment's warrant requirement is the automobile exception which permits the "warrantless search of a readily mobile vehicle…when law enforcement has probable cause to believe the vehicle contains contraband or evidence of a crime."[57] The scope of this exception is broad: "[w]hen there is probable cause to

---

[51] *Id.* ("The information necessary to show probable cause must be contained within a written affidavit given under oath.").

[52] *United States v. Wilson*, No. 25-30105, 2025 WL 2490719, at *4 (5th Cir. Aug. 29, 2025) (quoting *United States v. Payne*, 341 F.3d 393, 400 (5th Cir. 2003)).

[53] *United States v. Satterwhite*, 980 F.2d 317, 320 (5th Cir. 1992) (citing *United States v. Leon*, 468 U.S. 897, 922-23 (1984)).

[54] *Wilson*, 2025 WL 2490719, at *3 (quoting *United States v. Leon*, 468 U.S. 897, 922-23 (1984)).

[55] *Satterwhite*, 980 F.2d at 321; *see also United States v. Brown*, 567 F. App'x 272, 282 (5th Cir. 2014).

[56] *United States v. Guzman*, 739 F.3d 241, 245–46 (5th Cir. 2014).

[57] *United States v. Clayton*, 98 F.4th 256, 263 (5th Cir. 2024) (citing *Rountree v. Lopinto*, 976 F.3d 606, 609 (5th Cir. 2020); *United States v. Fields*, 456 F.3d 519, 523 (5th Cir. 2006); *California v. Acevedo*, 500 U.S. 565, 580, 111 S.Ct. 1982, 114 L.Ed.2d 619 (1991)).

search for contraband in a car, it is reasonable for police officers...to examine packages and containers without a showing of individualized probable cause for each one."[58]

### B. The Fifth Amendment

The Fifth Amendment guarantees that "No person... shall be compelled in any criminal case to be a witness against himself..."[59] As part of this right, individuals must be warned prior to any custodial interrogation that they have right to remain silent, that anything said can be used against them in court, that they have a right to counsel, and that counsel will be appointed if they cannot afford counsel.[60] This warning "must be administered prior to any 'custodial interrogation.'"[61] To determine whether a person is "in custody" courts must inquire how a reasonable man in the suspect's position would have understood his situation."[62] Thus, for the purposes of a *Miranda* warning, a person is considered to be "in custody" "when placed under formal arrest or when a reasonable person in the suspect's position would have understood the situation to constitute a restraint on freedom of movement of the degree which the law associates with formal arrest."[63]

In addition, law enforcement is not permitted to interrogate a suspect to obtain an inculpatory statement before advising him of their rights, then advise the suspect of his rights, and then obtain the inculpatory statement previously elicited.[64] The

---

[58] *Wyoming v. Houghton*, 526 U.S. 295, 302, 119 S. Ct. 1297, 1301, 143 L. Ed. 2d 408 (1999).
[59] U.S. CONST. amend. V.
[60] *Miranda v. Arizona*, 384 U.S. 436, 479, 86 S.Ct. 1602, 1630, 16 L.Ed.2d 694 (1966).
[61] *United States v. Bengivenga*, 845 F.2d 593, 595 (5th Cir. 1988) (internal citation omitted).
[62] *Berkemer v. McCarty*, 468 U.S. 420, 422, 104 S. Ct. 3138, 3141, 82 L. Ed. 2d 317 (1984).
[63] *United States v. Cavazos*, 668 F.3d 190, 193 (5th Cir. 2012) (internal citation omitted).
[64] *Missouri v. Seibert*, 542 U.S. 600, 124 S. Ct. 2601, 159 L. Ed. 2d 643 (2004).

Fifth Circuit, following the test elicited by Justice Kennedy in his concurrence, has held that "postwarning statements that are related to the substance of prewarning statements must be excluded unless curative measures are taken before the postwarning statement is made."[65]

## III.    ANALYSIS

### A.  Motion to Suppress Evidence, Fruits, and Statements on May 2, 2024

In meeting with a concerned citizen about alleged drug trafficking occurring in the Fat City neighborhood of Metairie, Deputy Andrew Scott received a tip about a black man driving a dark-colored Range Rover selling illegal narcotics.[66]   Deputy Scott testified that he located the vehicle at 3420 Edenborn Ave. in Metairie and ran a vehicle inquiry, discovering that the vehicle was owned by Kernelius Alford.[67] Scott also testified that he ran a criminal history check of Alford, discovering prior arrests for possession of illegal drugs and firearms.[68] Less than a month later, on May 2, 2024, Scott attempted to stop Alford for traffic violation for speeding. Alford's vehicle attempted to evade the traffic stop, ultimately colliding with another vehicle as it crossed West Esplanade Avenue. Alford then turned onto a side street before stopping the vehicle, exiting, and fleeing on foot. He ran into the backyard of a home on the

---

[65] *United States v. Courtney*, 463 F.3d 333, 338 (5th Cir. 2006) (quoting *Seibert*, 542 U.S. at 622 (Kennedy, J., concurring in the judgment). This Court also looks to Justice Kennedy's concurrence because "[i]t is well established that when we are confronted with a plurality opinion, we 'look to that position taken by those Members who concurred in the judgments on the narrowest grounds.'" *Courtney*, 463 F.3d at 338 (quoting *Pedcor Mgmt. Co., Inc. Welfare Benefit Plan v. Nations Personnel of Tex., Inc.* 343 F.3d 355, 358 (5th Cir.2003) (quoting *Campbell v. St. Tammany Parish Sch. Bd., Inc.*, 64 F.3d 184, 189 (5th Cir.1995))).
[66] Transcript at p. 7.
[67] Transcript at p. 8.
[68] *Id*.

side street at which point he was apprehended by Deputy Scott. Deputy Scott then escorted Alford to a patrol car.

In the instant Motion, Alford argues that (1) Deputy Scott conducted an unconstitutional interrogation as Alford was sitting in the patrol vehicle after being apprehended and that (2) the search of Alford's car after his arrest was unconstitutional. The Government responded that the statements made by Alford to Deputy Scott were voluntary in nature and that no interrogation occurred and that (2) the search of the automobile was permissible under the automobile exception to the warrant requirement or, alternatively, that the evidence is admissible due to the inevitable discovery doctrine.

### 1. Statements

Alford argues that the conversation that took place outside of Scott's car amounted to a custodial interrogation and that, in accordance with *Miranda*, Alford's statements must be suppressed.[69]

At the beginning of the interaction between Scott and Alford, Scott patted down Alford and then asked him for identification to which Alford responded that he did not have any identification.  Alford then stated that he had two guns in the car. The requirements of Miranda mandate that evidence obtained as a result of custodial interrogation may not be used against a defendant unless and until warning and

---

[69] The Government does not contest the fact that Alford was in custody. ("Notably, while Alford sat alone in custody in the back of Deputy Scott's unit, he uttered out…" (R. Doc. 43 at p. 14)).

waiver are demonstrated by the Government.[70] Alford's statement that he had two guns in the car was not a *result* of custodial interrogation; they were voluntary statements given by a suspect in custody and were not elicited via custodial interrogation. Therefore, the strictures of *Miranda* do not apply to that statement.

Deputy Scott testified at the evidentiary hearing that prior to advising Alford of his rights under *Miranda*, he asked Alford if he was a felon.[71] The Court finds that testimony credible. The Government characterizes this question as a routine booking question and thus argues that it is excepted from the requirement that a suspect receive a *Miranda* warning before any custodial interrogation.

The Government relies on *Pennsylvania v. Muniz* to argue that questions regarding a suspect's criminal history are part of the routine booking question exception to *Miranda*.[72] This reliance is misplaced. In *Muniz*, the questions found to be part of the routine booking question exception were the suspect's "name, address, height, weight, eye color, date of birth, and current age."[73] A question regarding criminal history is of a whole other character than the questions enumerated in the Court's opinion in *Muniz*. The Government fails to cite any Fifth Circuit precedent that such exception applies to questions related to a suspect's criminal history. To the contrary, this Circuit has expressly held that "questions designed to elicit incriminatory admissions are not covered under the routine booking question

---

[70] *Miranda v. Arizona*, 384 U.S. at 479 (1966) ("But unless and until such warnings and waiver are demonstrated by the prosecution at trial, no evidence obtained as a result of interrogation can be used against him.").

[71] Transcript at p. 19.

[72] R. Doc. 43 at p. 14.

[73] *Muniz*, 496 U.S. 582, 601, 110 S. Ct. 2638, 2650, 110 L. Ed. 2d 528 (1990).

exception."[74] From Alford's voluntary statement that he had guns in the car, the Court finds that the question regarding Alford's felon status was motivated by a desire to determine if he had violated any state or federal laws regarding firearm possession. Because such question was designed to elicit an incriminatory statement, the pre-warning question about Alford's felon status was unconstitutional.

The analysis does not end there. The Supreme Court has recognized the independent source doctrine presents an exception to the exclusionary rule and has described the purpose behind the doctrine:

> [T]he interest of society in deterring unlawful police conduct and the public interest in having juries receive all probative evidence of a crime are properly balanced by putting the police in the same, not a *worse,* position that they would have been in if no police error or misconduct had occurred...When the challenged evidence has an independent source, exclusion of such evidence would put the police in a worse position than they would have been in absent any error or violation...[75]

For a Court to find that the independent source to apply, the evidence obtained via the independent source must be identical to the piece of evidence that had been obtained unlawfully.[76] In this case, Deputy Scott elucidated an independent source while testifying during the evidentiary hearing; at his disposal, he had national databases through which he could conduct a criminal inquiry to determine Alford's felon status.[77] Suppressing the fact that Alford is a felon in spite of the independent source available to investigating officer would put the police department in a worse

---

[74] *United States v. Virgen-Moreno*, 265 F.3d 276, 293–94 (5th Cir. 2001); *see also United States v. Arellano-Banuelos*, 912 F.3d 862 (5th Cir. 2019) (holding that *Miranda* was violated when officers asked a suspect about his immigration status and prior deportations without advising him of his rights).
[75] *Nix v. Williams,* 467 U.S. 431, 443, 104 S. Ct. 2501, 2509, 81 L. Ed. 2d 377 (1984).
[76] *United States v. Zavala*, 541 F.3d 562, 578 (5th Cir. 2008).
[77] Transcript at p. 20.

position than they would have been had the misconduct not occurred in this case. As a result, suppression is not the appropriate remedy for this violation, and Alford's admission of his felon status is not suppressed.

### 2.  Search of the Car

Alford does not challenge the propriety of the traffic stop in his Motion; instead, Alford argues that the warrantless search of the car was unreasonable. The Court finds that Deputy Scott had reasonable articulable suspicion to stop Alford because of his traffic violations. Traffic stops are analyzed under the test articulated in *Terry v. Ohio*, in which courts must determine if the officer's action was (1) "justified at its inception"; and (2) "reasonably related in scope to the circumstances which justified the interference in the first place."[78]

To satisfy the first prong, "an officer must have an objectively reasonable suspicion that some sort of illegal activity, such as a traffic violation, occurred, or is about to occur, before stopping the vehicle."[79] Here, Scott observed Alford commit several traffic violations, including reckless driving, hit and run driving, and failure to yield. Such traffic infractions form an objectively reasonable basis for Scott to stop Alford's car. To satisfy the second prong, "detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop."[80] Additionally, if the officer develops reasonable articulable suspicion of additional criminal activity afoot, "he may further detain its occupants for a reasonable time while appropriately

---

[78] *United States v. Lopez-Moreno*, 420 F.3d 420, 430 (5th Cir. 2005) (quoting *Terry v. Ohio*, 392 U.S. 1, 20, 88 S. Ct. 1868, 1879, 20 L. Ed. 2d 889 (1968)).
[79] *Id.*
[80] *United States v. Brigham*, 382 F.3d 500, 507 (5th Cir. 2004) (en banc).

attempting to dispel this reasonable suspicion."[81] The stop and subsequent arrest of Alford were not longer than necessary to effectuate the purpose of citing him for traffic violations and, once acquiring reasonable articulable suspicion of criminal activity, arresting Alford for those offenses. For these reasons, the Court finds that the traffic stop was proper.

A warrantless search is presumed to be unreasonable "unless the circumstances fall under an exception to the Fourth Amendment's warrant requirement."[82] One such exception is the automobile exception.[83] Under this exception to the Fourth Amendment's warrant requirement, "a warrantless search of a readily mobile vehicle is permitted when law enforcement has probable cause to believe the vehicle contains contraband or evidence of a crime."[84]

Deputy Scott had probable cause to believe that Alford's vehicle contained contraband or evidence of a crime. Scott testified that he smelled "a strong odor of marijuana" and that he observed a firearm in Alford's vehicle in plain view prior to initiating the search of the vehicle.[85] The Court finds that Scott's testimony was credible. Taken together and when viewing the totality of the circumstances, the gun in plain view, the strong odor of marijuana, and Scott's knowledge of Alford's criminal history regarding drugs create probable cause to believe that the vehicle contained

---

[81] *United States v. Pack*, 612 F.3d 341, 350 (5th Cir.), *opinion modified on denial of reh'g*, 622 F.3d 383 (5th Cir. 2010).
[82] *United States v. Clayton*, 98 F.4th 256, 261 (5th Cir. 2024).
[83] *United States v. Riojas*, 139 F.4th 465, 474 (5th Cir. 2025).
[84] *Clayton*, 98 F.4th at 263.
[85] Transcript at p. 24.

contraband and evidence of a crime.[86] Because officers had probable cause to believe that Alford's vehicle contained contraband or evidence of a crime, the search of the vehicle was proper under the automobile exception. As such, the Court denies the Motion as it relates to the search of the vehicle.

**B. Motion to Suppress Evidence and Fruits Seized on November 21, 2024**

After Alford was indicted by a federal grand jury, a federal arrest warrant was issued. JPSO and HSI learned that Alford was residing in Room 315 of the Ramada Inn in Metairie, and on November 21, 2024, they sought and received a search warrant from the 24th Judicial District Court in Jefferson Parish for the hotel room.

In the instant Motion, Alford challenges that warrant. He argues that the affidavit in support of the warrant did contain any facts that suggested that Alford had or was hiding illicit drugs or firearms in his hotel room and thus lacked a nexus between the place to be searched and the items sought.[87] He further contends that the Government cannot meet the requirements of the good-faith exception established in *United States v. Leon*, because the affidavit was so lacking in the indicia of probable cause that reliance on it was unreasonable.[88] The Government responds that the facts in the affidavit were sufficient to establish probable cause and establish a nexus between the suspected criminal activity and the hotel room.[89] It also avers that even if the warrant was insufficient to establish probable cause to

---

[86] See, e.g., *United States v. McSween*, 53 F.3d 684, 686 (5th Cir. 1995) (holding that the smell of marijuana alone "may be ground enough for a finding of probable cause"); *United States v. Young*, 816 F. App'x 993, 996 (5th Cir. 2020) (finding that probable cause existed to extend a search after considering, among other things, the suspect's criminal history related to drugs).
[87] R. Doc. 38-1 at p. 7.
[88] *Id*.
[89] R. Doc. 45 at pp. 7-8.

search, the *Leon* good faith exception applies, and the evidence should not be suppressed.[90] In his Reply, Alford emphasizes the difference between probable cause to arrest and probable cause to search and re-urges his argument that reliance on the insufficient affidavit was unreasonable and that, as a result, the good-faith exception does not apply and the evidence must be suppressed.[91]

A written affidavit made in support of the issuance of a search warrant must contain "[t]he information necessary to show probable cause."[92] As part of that showing of probable cause, facts contained in the affidavit "must establish a nexus between the house to be searched and the evidence sought."[93] The Court finds that the written affidavit provided to obtain the warrant does not contain the facts necessary to establish a nexus between the place to be searched and the evidence sought. The affidavit details Alford's criminal history, notes that Alford has been indicted by a federal grand jury, discusses Alford's phone that is registered to a completely different address, explains how the officers know that Alford is living in the room of the Ramada Inn, provides a brief mention that there has been some loud noise emanating from the room, and contains a final conclusory statement that the affiant "believes Alford may have weapons and illegal narcotics within his hotel room, Room 315."[94] "Mere conclusory statements are insufficient to constitute probable cause."[95]

---

[90] *Id.* at 10.
[91] R. Doc. 48.
[92] *United States v. Brown*, 941 F.2d 1300, 1302 (5th Cir. 1991).
[93] *United States v. Payne*, 341 F.3d 393, 400 (5th Cir. 2003).
[94] R. Doc. 38-2 at p. 3.
[95] *Brown*, 941 F.2d at n. 3.

Like the affidavit in *Wilson*, this affidavit offers nothing—no observations, no inferences, no corroborated tips— linking" Alford's alleged drug trafficking to Room 315 of the Ramada Inn.[96] The affidavits also both contain a conclusory "belief" statement regarding the likelihood that the evidence of a crime will be found at the location to be searched. Relying on the binding precedent of the Fifth Circuit, this Court finds that assertion inadequate to support a finding of probable cause.[97]

Even though the Government possessed a valid arrest warrant, the arrest warrant concerns the person, a search warrant concerns the place. "And the Constitution demands a factual bridge between the two."[98] Both the affidavit and the Government's briefing misunderstand this requirement. While Alford at the time was a federal fugitive, Sgt. Lassus testified the officers were there to execute the search warrant; the Court finds that testimony credible.[99] The affidavit provides no evidence that the search of the hotel room was in any way related to Alford's fugitive status. Probable cause to arrest is not probable cause to search. Because the affidavit on its face did not elucidate probable cause to search, the warrant is invalid.

Suppression, however, for an improper search warrant is not mandated by the Constitution.[100] The exclusionary rule is "a judicially-created remedy" and "is justified by the deterrent effect of suppressing evidence when it was obtained

---

[96] *United States v. Wilson,* 153 F.4th 478, 485 (5th Cir. 2025).
[97] *See id*. at 486-89 (reviewing relevant Fifth Circuit precedent).
[98] *Id*. at 485.
[99] Transcript p. 40 ("I was moving back and forth overseeing the search warrant…"); Transcript p. 41 ("At that point we watched him or he was watched by one of the detectives while we executed the search warrant -- or cleared the room, I guess I should say, to make it safe.").
[100] *United States v. Morton*, 46 F.4th 331, 336 (5th Cir. 2022).

unlawfully."[101] As a result, constitutional criminal procedure jurisprudence has recognized a good-faith exception that allows the admission of "evidence obtained by officers in objectively reasonable good-faith reliance upon a search warrant…even though the warrant was unsupported by probable cause."[102] Such exception, however does not apply to warrants based on so-called "bare-bones" affidavits, which are affidavits that are "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable."[103] When affidavit is found to be "bare-bones," "the good-faith exception falls away and the exclusionary rule governs."[104]

The present affidavit is skeletal. When compared to other affidavits for search warrants that have been scrutinized by the Fifth Circuit, this affidavit is among the barest. The affidavit at issue in *United States v. Satterwhite* specifically discussed the criminal activity that occurred at the apartment for which the search warrant was being issued.[105] The affidavit in the present case does not detail any criminal activity that allegedly occurred in Room 315 of the Ramada Inn.[106] In *United States v. Bell*, the Fifth Circuit held that the *Leon* exception did apply because the affidavit did include facts that made the affidavit more than "bare bones," such as "direct observations that Bell travelled directly from the house to a drug sale" and a notation of "the common tendency of drug traffickers to store contraband at home."[107] The

---

[101] *Id.*
[102] *United States v. Laury*, 985 F.2d 1293, 1311 (5th Cir. 1993) (citing *United States v. Leon*, 468 U.S. 897, 922-23, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984)).
[103] *Leon*, 468 U.S. at 923.
[104] *Wilson*, 153 F.4th at 484 (5th Cir. 2025) (citing *Morton*, 46 F.4th at 337-38.).
[105] *Satterwhite*, 980 F.2d 317, 321-22 (5th Cir. 1992).
[106] *See* R Doc. 38-2.
[107] *United States v. Bell*, 832 F. App'x 298, 302 (5th Cir. 2020).

20

affidavit in the present case contains neither of these types of information. Lastly, and most factually analogous to this case, the Fifth Circuit Court held in *United States v. Brown* that the *Leon* exception did not apply when the affidavit only contained "a bare-bones assertion that it was believed that drugs would be found in the residence."[108] The affidavit here, like the one in *Brown*, contained none of the facts related to the federal investigation into Alford's alleged drug trafficking activities—which, apparently, law enforcement was aware of prior to the application for the search warrant—and further failed to allege any connection between the alleged activities and the hotel room to be searched. Like *Wilson*, "[t]he warrant here rested on faith, not facts, and the good-faith exception cannot salvage such a bare-bones showing."[109] Suppression is required.

Having found that the search was improper, the Court now turns to Alford's argument that the statements that he made about the items illegally seized should be suppressed as fruit of the poisonous tree. This doctrine provides that all evidence seized as a result of an illegal search or seizure "must be suppressed, unless the government shows that there was a break in the chain of events sufficient to refute the inference that the evidence was a product of the Fourth Amendment violation."[110] Courts need not hold that all evidence is the fruit of the poisonous tree "simply because it would not have come to light but for the illegal actions of the police."[111] The Supreme Court urges Courts to examine whether, having found that the police acted

---

[108] *United States v. Brown*, 567 F. App'x 272, 284 (5th Cir. 2014).
[109] *Wilson*, No. 25-30105, 2025 WL 2490719, at *7 (5th Cir. Aug. 29, 2025).
[110] *United States v. Portillo-Aguirre*, 311 F.3d 647, 658 (5th Cir. 2002).
[111] *Wong Sun v. United States*, 371 U.S. 471, 488, 83 S. Ct. 407, 417, 9 L. Ed. 2d 441 (1963).

unlawfully, the evidence to which the Defendant objects "has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint."[112]

The Defendant has acknowledged that probable cause to arrest and probable cause to search are "two distinct concepts."[113] Here, there was an outstanding federal warrant for Alford's arrest, and his arrest was, therefore lawful. Because the statements were made during a lawful arrest, the taint of the illegal search does not spread so far as to reach Alford's post-arrest statements.[114] The Court finds that the statements made to the officers after his arrest at the Ramada Inn were not the fruit of the poisonous tree and are not subject to the exclusionary rule, even though the evidence and items seized during the search must be suppressed as a result of the invalid search warrant.[115]

### C. Motion to Suppress Statements on November 21, 2024

As part of their execution of the search warrant, JPSO officers detained and then arrested Alford. During the detainment and arrest, these officers interrogated him, and Alford answered their questions.

In the instant Motion, Alford separately challenges the constitutional propriety of that interrogation under *Miranda*. He argues that the statements must be suppressed because they were obtained prior to advising Alford of his rights under

---

[112] *Id.*
[113] R. Doc. 48 at p. 2.
[114] Alford does not challenge the voluntariness of his statements in the written motion. To the extent that his motion does, this Court finds that the statements were voluntary.
[115] The Court finds Sgt. Lassus's testimony during the hearing to be credible that Alford was advised twice of his rights under *Miranda v. Arizona*, as explained further below.

*Miranda* and, furthermore, because the statements were made as part of an unconstitutional two-step interrogation process, prohibited by the Supreme Court in *Missouri v. Seibert*.[116] The Government responds that the interrogation was not violative of *Seibert* because Alford never identified any pre-warning inculpatory statement, as is required by the two-step interrogation jurisprudence.[117] Furthermore, the Government contends that the statements made after the on-camera warning were not part of the same interrogation as the one before the on-camera warning.[118] Lastly, the Government argues that Alford was advised of his *Miranda* rights prior to the on-camera warning. In his Reply, Alford takes issue with the Government's timeline, arguing that Alford did make a prewarning incriminating statement and that the pre- and post-warning statements were part of the same interrogation, implicating *Seibert*.

For the Government to use a custodial statement against a defendant, it must show "that the defendant was warned of his right to remain silent and his right to consult with an attorney."[119] The principal question raised by this motion is whether Alford was informed of these rights prior to any custodial interrogation. Sergeant Lassus testified at the evidentiary hearing that Alford did interact with Detective Evans and that this interaction was not captured on body-worn camera ("BWC").[120] After he was arrested, Lassus testified that Alford began to make a statement to

---

[116] R. Doc. 37-1 at pp. 3-4; 542 U.S. 600 (2004). Both Alford and the Government acknowledge that the first portion of Alford's interaction with officers occurred before officers' body cameras were activated, and, as a result, there is no recording of the interaction.
[117] R. Doc. 44 at p. 5.
[118] *Id*.
[119] *United States v. Anderson*, 755 F.3d 782, 790 (5th Cir. 2014).
[120] Transcript at p. 48.

Evans and that Evans began to advise Alford of his rights.[121] Sgt. Lassus further stated that after he heard Detective Evans start to advise Alford of his *Miranda* rights and that he stepped away to turn on his own BWC to capture Evans's interaction with Alford.[122] This testimony differs from the Government's Response to Alford's Motion to Suppress statements, in which the Government avers that Lassus previously advised Alford of his *Miranda* rights off camera prior to any officers interrogating Alford.[123] The Court finds the testimony of Lassus credible regarding Alford being Mirandized twice, once by Evans and once by Lassus, and finds that the Government's factual statement in its Response is inaccurate. Based on the testimony adduced during the hearing that the Detective Evans advised Alford of his *Miranda* rights prior to any interrogation, the Court finds that the Government has met its burden to prove the admissibility of Alford's statements because Alford was advised of his *Miranda* rights.[124] As a result, the Motion to Suppress Statements on November 21, 2024 is denied.

## IV.    CONCLUSION

For the foregoing reasons,

**IT IS HEREBY ORDERED** that the Motion to Suppress Evidence, Fruits, and Statements on May 2, 2024, and the Motion the Suppress Statements on November 21, 2024[125] are **DENIED**.

---

[121] Transcript at p. 49.
[122] Transcript at p. 49.
[123] R. Doc. 44 at p. 3, n. 1.
[124] *Brown v. Illinois*, 422 U.S. 590, 604, 95 S. Ct. 2254, 2262, 45 L. Ed. 2d 416 (1975) ("…the burden of showing admissibility rests, of course, on the prosecution.").
[125] R. Docs. 36, 37.

**IT IS FURTHER ORDERED** that the Motion to Suppress Evidence and Fruits Seized on November 21, 2024,[126] is **GRANTED in part** and **DENIED in part**. The Motion is **GRANTED** as it applies to the evidence and fruits seized as part of the search of Ramada Inn Room 315. It is in all other respects, including as it pertains to the Defendant's statements, **DENIED**.

**IT IS FURTHER ORDERED** that the evidence and fruits of the search seized in the execution of the search warrant for Ramada Inn Room 315 on November 21, 2022, are **SUPPRESSED**.

New Orleans, Louisiana, December 1, 2025.

**WENDY B. VITTER**
**United States District Judge**

---

[126] R. Doc. 38.